UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JESSICA PEARSON,

    Plaintiff,

v.               Case No. 14-C-630

CAROLYN COLVIN,

    Defendant.

**DECISION AND ORDER**

  Plaintiff Jessica Pearson appeals the denial of Supplemental Security Income (SSI) benefits to her daughter, herein known as the claimant. For the reasons given below, the decision of the Commissioner will be remanded for further proceedings.

**I. Background**

  The claimant, born in 2002, displayed several behavioral problems in her early school years. These included defiant behavior, stealing things, lying, walking out of classes, becoming belligerent, and difficulty making friends. In addition, she had learning problems and difficulty staying on task, completing work accurately, and playing with others. On some occasions, the police became involved. School staff frequently conducted IEPs (individualized education programs) to try to manage her growth. Still, she was suspended from school on several occasions and spent a large portion of her time at school in an EBD (emotional behavioral disorder) room, where she was often secluded.

  In 2010, at the age of seven, the claimant was diagnosed with Charcot-Marie-Tooth disease,

a hereditary neurological disorder characterized by neuropathy and weakness in the limbs. The claimant's mother and all of her siblings have the disease. At that time, although she had trouble heel-walking, most of her physical tests were normal. (R. 366-68.) Her mother reported Plaintiff would sometimes experience pain and clumsiness, which resulted in injury. (R. 366.)

The claimant underwent a psychosocial exam with a state agency consultant, Robert Schedgick, Ph.D. in July 2010. The report notes that the claimant's performance in math was at the second-grade level, while language was at the first-grade level. (R. 374.) The claimant was well-behaved during the exam and expressed no anxiety at being separated from her mother. The examiner noted the claimant was oppositional and immature, using "babyish" language and even sucking her thumb. (R. 379.) She was mostly calm and pleasant but could become angry when she didn't like the examiner's requests. She had an appropriate "stream of mental activity," was able to understand questions and converse, and there was no evidence of any thought disorder. (R. 380.) She was able to report the correct day and date; knew the last major holiday; and knew that Barack Obama was president and that George W. Bush had preceded him. (R. 381.) The claimant was able to read, which she does 15 to 20 minutes per day; she can make her own lunch, and she assists in drying dishes and plays on the computer.

The claimant performed at the low-normal range in her intelligence test, but the examiner noted the lower scores were likely due to oppositional behavior (i.e., giving up) rather than any true intelligence defect. Ultimately, the examiner diagnosed oppositional defiant disorder as the main culprit that was holding the claimant back. He also noted the claimant's immature behavior. He assessed a GAF score of "probably" between 70 and 75. (R. 387.)

In July 2010, a state agency reviewing psychiatrist (M.D.) and psychologist (Ph.D.) found

2

the claimant had "less than marked" limitations in acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; and physical well-being. (R. 393-94.) They found a "marked" limitation in the claimant's ability to care for herself, largely due to her anger and oppositional nature, which sometimes made her violent. (R. 394.) These findings were affirmed by two other reviewers. (Tr. 453.)

In 2012 the claimant experienced increased clumsiness and weakness and reported to Terence Edgar, MD. Dr. Edgar found her an "alert, delightful and interactive patient" (R. 491) who had slight decreases in vibration sense and mild ankle dorsiflexion weakness. He referred her for ankle foot orthoses. Other than clumsiness and occasional muscle spasms, she was doing well. (R. 490.)

The hearing took place before an ALJ on August 17, 2012. The claimant testified that she was wearing new braces on her legs but that she usually left them at home because they were uncomfortable. (R. 44) Without them, she could walk but she fell more frequently. She stated that she didn't do well in school, that math "comes in one ear and goes out the other," and that she could read but had trouble with "chapter books." (R. 45-46.) She testified that she was in trouble a lot at school two years earlier, but that last year she "learned my lesson . . . and didn't get into trouble at school." (R. 52.) Sports and recess were difficult sometimes because she had trouble running and jumping. She explained that she had pain in her legs walking up and down stairs, and if she walked for more than five minutes. Without the braces on, her legs would go into spasm and cramp up, causing her to "turn into a ball" and start crying. (R. 58.)

The claimant's mother testified that she and two of her sons also had Charcot-Marie-Tooth disease, and all three received Social Security benefits, which is how they survived financially. She

3

stated that her daughter still has behavior problems in school, due in part to pain and in part to the fact that the other kids make fun of her. She still spent significant time in the special education room as well as a six-by-six padded room. She would have to come to school to pick up her daughter or talk to her on a regular basis due to outbursts. The Plaintiff said her daughter is best at being a good helper in the kitchen and can cook macaroni and cheese by herself, but other, more physical, pursuits are a challenge. She likes to ride her bike, but it is difficult or impossible with braces on. They like to go fishing, but the claimant often becomes impatient. At night sometimes, she lets out a "blood curdling scream" when spasms become too painful, and her brother will have to sit on her leg to get things under control. (R. 85.)

In his written decision, the ALJ found the claimant had the severe impairments of Charcot-Marie-Tooth and oppositional defiant disorder. (R. 97.) He further found the claimant did not have an impairment or combination of impairments that met any of the listings (R. 98), nor did she have impairments functionally equaling the listings.

**II. Analysis**

The Social Security Act authorizes judicial review of the final decision of the agency and mandates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). A court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *Briscoe v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence is more than a mere scintilla but may be less than the weight of the evidence. *Sheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004). Thus, substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

4

389, 401 (1971).

In assessing whether a combination of impairments functionally equals the listings for children, an ALJ considers six "domains" of functioning: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and health and physical well-being. To functionally equal the listings, the child's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). To constitute a "marked" limitation, an impairment must seriously interfere with the ability to initiate, sustain or complete activities. 20 C.F.R. § 416.926a(e)(2).

Here, the ALJ did find a marked impairment in the claimant's ability to care for herself. Thus, to functionally equal the listings, the claimant must establish a marked limitation in at least one of the other five domains of functioning.

## A. Interacting and Relating with Others

The Plaintiff first argues that the ALJ erred by failing to find the claimant had a marked and severe impairment in interacting with and relating to others. SSR 09-5p directs that, "In this domain, we consider how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i).

The ALJ cited a 2010 IEP that described the claimant as very friendly and striving to please adults. (R. 104.) He noted that records showed she had difficulty making friends and playing cooperatively. At the same time, however, she was calm and pleasant during the consultative exam, and indicated to the psychologist that she had 1000 friends and played with them at school and at

5

home. The ALJ's conclusion largely echoed the brief analysis provided by the state agency reviewers. (R. 393.)

For school age children (6 to 12), the regulation indicates that "you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences." 20 C.F.R. § 416.926a(i)(2)(iv). The testimony and other evidence suggested, however, that the claimant essentially had no "real" friends, was made fun of at school, beat up or threatened other kids, spent a great deal of time in isolation at school, had numerous violent outbursts, and relied on her brother and / or cousin to defend her from insults or others who would make fun of her after she fell or because she was wearing braces. (R. 71.) The claimant's stray remark about having "1000 friends" was clearly a fantasy, given the other evidence, and yet that comment was cited *as though true* by the state agency examiners as well as the ALJ. In actuality, the examining psychologist's report indicates that "she *says* [she] has about a thousand friends," not that she actually did (R. 383), and the claimant clearly had a lengthy history of making up stories. Given her oppositional nature, which the same examiner noted would impede her ability to make friends (R. 387), it appears the state agency reviewers and the ALJ erred by relying on the "1000 friends" comment without its context.

The Plaintiff testified that her daughter (the claimant) might think she had a few friends, but they made fun of her behind her back. (*Id.*) If the claimant got to school early, she would just walk around outside in an effort to avoid other children, and she would seek out teachers with whom she was comfortable in order to sit in their classrooms as a way to avoid interacting with peers. (R. 75-76.) Her birthday party was the day following the hearing, and no friends were attending. The one

6

"friend" she testified about was a much younger boy who was in her special ed class. A note from September 2011 states that the claimant plays only with siblings or cousins and that her negative behaviors get in the way of her making lasting relationships with other children. (R. 472.) The January 2011 IEP report indicates an "inability to develop or maintain satisfactory interpersonal relationships" and "extreme aggressiveness for long periods of time." (R. 274.)

As described below, the ALJ did not specifically discount either the mother's credibility or the claimant's. The records discussed above (and others), as well as the testimony, paints a portrait of a girl who could not be expected to "develop more lasting friendships with children who are your age" or to "work in groups to create projects and solve problems." 20 C.F.R. § 416.926a(i)(2)(iv). Nor does she "cooperate with others, comply with rules, [or] respond to criticism . . ." 20 C.F.R. § 416.926a(i). Clearly, there are some adults with whom she gets along, but there is almost no evidence that she has the ability to establish meaningful relationships with peers other than relatives. Accordingly, the case will be remanded for further proceedings.

**B. Attending and Completing Tasks**

Plaintiff also argues that the ALJ erred by finding the claimant had a less than marked impairment in attending and completing tasks. This inquiry considers how well a child can "focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h). The regulations further provide as follows:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You

> should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).

The ALJ concluded that although the claimant had serious problems organizing things and working without distractions, a neurological exam shows activity and attention within normal limits. (R. 103.) In addition, she could be directed with "clear, firm directs" during the consultative exam, and she was able to change from one task to another without focus problems. (*Id.*)

Again, this conclusion was drawn almost verbatim from the notes made by the state agency reviewers, who concluded the claimant had a less than marked limitation in this category. (R. 393.) The opinions of the state agency psychologist and psychiatrist, which were affirmed by other reviewers, are entitled to some weight, particularly when there are no examining physician or psychologist records that cut the other way. Above, I found it error to rely on state agency reviewers because their opinion appeared to be infected by a factual error, namely, the reliance on the claimant's fantastical claim of having "1000 friends." Here, there does not appear to be any such error. The record shows difficulty in completing tasks, but the ALJ noted that firm directives and assistance could overcome that difficulty in many situations. A conclusion that a claimant has "less than marked" limitations does not of course mean she has *no* limitations; instead, it merely means that the limitations are at the moderate level or less. 20 C.F.R. § 416.926a(e)(2). Here, the ALJ and state agency reviewers reasonably concluded that the claimant's admitted difficulties were more in the moderate category, given her satisfactory performance during not one but two examinations

8

(neurological and consultative psychosocial). Clearly she has difficulties, but the evidence cited by the Plaintiff does not point to those difficulties falling into the "marked" category.

**C. Credibility**

Finally, Plaintiff alleges the ALJ erred by not articulating why he discounted the Plaintiff's and the claimant's credibility. The ALJ did use the common boilerplate credibility phrase, finding that "statements . . . are not credible to the extent they are inconsistent with [the] finding that the claimant does not have an impairment . . . that functionally equals the listings." (R. 100.) The ALJ also noted that the claimant had various abilities that were within the normal range, such as understanding and remembering information, and sometimes acted appropriately for her age as well. She also testified that she had a friend at school. The ALJ further noted that the Plaintiff stated that her daughter has to wear her braces, but her daughter was non-compliant with wearing them. The ALJ also found that the claimant's CMT disease did not produce severe neurological defects.

To some extent the credibility determination is tied together with the analysis set forth above. As I found in Section A, the biggest problem is that the ALJ did not adequately explain why he believed the claimant had the ability to make and maintain relationships. He noted that she has "a friend at school" but didn't point out that her friend was not even in second grade yet and their relationship was limited to her sometimes helping him in the special ed class they shared. (R. 52.) The ALJ's other observations are within the bounds of reasonableness, for example, his conclusion that the claimant's behavior had improved in more recent years. (R. 100.) But there remains no persuasive explanation for why the claimant would have anything but a marked limitation in interacting and relating with others. To arrive at such a conclusion, an ALJ would have to severely discount the testimony and other evidence that showed the claimant to have marked difficulty with

interpersonal relationships, but that did not occur here.

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is remanded pursuant to 42 U.S.C. § 405(g) (sentence 4) for further proceedings, namely, to reevaluate the claimant's ability to relate and interact with others.

**SO ORDERED** this 2nd day of July, 2015.

/s William C. Griesbach  
William C. Griesbach, Chief Judge  
United States District Court